# In the United States Court of Federal Claims

No. 24-1801C
(Filed: October 2, 2026)
**FOR PUBLICATION**

| | |
|---|---|
| LARIO OIL AND GAS COMPANY, | * |
| Plaintiff, | * |
| v. | * |
| THE UNITED STATES, | * |
| Defendant. | * |

*Kathleen C. Schroder*, Davis Graham & Stubbs, LLP, Denver, CO, for Plaintiff. With her on the briefs was *Mark E. Champoux*, Davis Graham & Stubbs, LLP, Denver, CO.

*Matthew J. Carhart*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, *Lisa L. Donahue*, Assistant Director, and *Rebecca T. Mitchell*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, as well as *Curt R. Sholar*, *John Byorth*, and *Lisa Bruno* of the Office of the Solicitor, United States Department of the Interior.

## OPINION AND ORDER

Plaintiff Lario Oil and Gas Company entered into a federal oil and gas lease (the "Lease"). Compl. ¶ 1 (ECF 1). Defendant later discovered that portions of the Lease included Indian trust lands belonging to the Mandan, Hidatsa, and Arikara Nation ("MHA Nation"). *Id.* ¶ 2. Defendant canceled the portions of the Lease covering Indian land and refunded payments that Plaintiff made in connection with that land. *Id.* ¶ 28. Plaintiff alleges that Defendant breached the Lease and seeks damages. *Id.* ¶¶ 43, 45, 49–50, 52. Defendant's motion to dismiss is fully briefed and I have heard oral argument.[1]

[1] *See* Def.'s Mot. to Dismiss (ECF 14) ("Def.'s Mot."); Pl.'s Resp. (ECF 17); Def.'s Reply (ECF 21); *see also* Oral Arg. Tr. (ECF 33) ("Tr."). At the Court's request, the parties filed supplemental briefs. *See*

Because formation of the Lease — as it related to Indian land — did not comply with any authorizing statute such as the Indian Mineral Leasing Act, those portions covering Indian land are void *ab initio*. The government's motion to dismiss is therefore **GRANTED**.

## BACKGROUND

### I. Statutory and Regulatory Background

This case principally implicates two parallel statutes: the Mineral Leasing Act of 1920, as amended, *see* 30 U.S.C. § 181 *et seq*. ("MLA"), and the Indian Mineral Leasing Act of 1938, as amended, *see* 25 U.S.C. § 396a *et seq*. ("IMLA"). Both statutes grant the Secretary of the Interior authority over mineral leases. But they have different domains and procedures, and are administered by different federal bureaus.

The MLA authorizes the Secretary to establish rules and regulations for leasing mineral rights on federal land. 30 U.S.C. § 189. The Secretary has delegated that authority to the Bureau of Land Management ("BLM"). *See* 43 C.F.R. §§ 3120.53(d)–(e), 3160.0-3, 3180.0-3; *see also* Bureau of Land Management, Montana State Office, Delegation of Authority, App. 2 at 20 (Aug. 13, 2009) (filed at ECF 36-1). The MLA does not, however, apply to leases on Indian land. Although the BLM plays a significant role in regulating the operation of oil and gas wells on Indian land, *see* 25 C.F.R. §§ 211.22(c), 211.28(h), 211.47(g), 211.51(b), 211.54(j)–(k), it cannot authorize leases there, *see* 43 C.F.R. §§ 3160.0-3, 3180.0-3.

When it comes to tribal land, other statutes govern. For purposes of this case, the parties focus on the IMLA.

Leases of mineral rights on Indian reservations under the IMLA are between the lessee and the Indian tribe, subject to the approval of the Secretary of the Interior. 25 U.S.C. § 396a. The statute permits the Secretary of the Interior to delegate his lease authority to officials in the Indian Reserve, now known as the Bureau of Indian Affairs ("BIA"). 25 U.S.C. § 396e; *see also Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1180 n.6 (10th Cir. 2011). Pursuant to that statute and the Secretary of the Interior's delegations, the authority to lease mineral rights on Indian land rests wholly with the BIA. *See* 25 C.F.R. § 211.20(a) (authorizing Indian mineral owners to lease their land "with the approval of the superintendent or area director"); *see also* 25 C.F.R. § 211.3 (defining "superintendent" and "area director" as BIA officials).

According to the IMLA's procedures, oil and gas leases must be offered for public auction. 25 U.S.C. § 396b; 25 C.F.R. § 211.20(a). Either Indian mineral owners

---

Order (ECF 22); Def.'s Suppl. Br. (ECF 23); Pl.'s Suppl. Br. (ECF 24). Both parties filed additional briefs after oral argument. *See* Pl.'s Post-Hearing Br. (ECF 34); Def.'s Post-Argument Br. (ECF 36).

or potential lessees may request that the BIA initiate an auction, but the sale is only advertised if the Indian mineral owner agrees. 25 C.F.R. § 211.20(a)–(b). Procedures for auctions are set by regulation, with the BIA charged with advising the Indian mineral owners and protecting their interests each step. 25 C.F.R. § 211.20(b)(1)–(5). If an auction yields a bid that the BIA considers to be in the Indian mineral owner's best interest, the Indian mineral owner can still choose to reject it. 25 C.F.R. § 211.20(b)(2), (c); 25 U.S.C. § 396b. When Indian mineral owners reject a bid, they may negotiate bilaterally with potential lessees and submit a proposed lease to BIA for review and approval. 25 U.S.C. § 396b; 25 C.F.R. § 211.20(b)(6), (d).

## II. Factual Background

Plaintiff and Defendant entered the Lease (NDM 102154) in 2011, using the procedures of the MLA. Compl. ¶¶ 1, 19–20; *id.* Ex. 1; *see* 30 U.S.C. § 181 *et seq.*[2] The Lease was executed by a BLM official. Compl. Ex. 1 at 1. The Lease did not follow IMLA procedures, and the BIA was not involved.

Nine years later, BLM informed Plaintiff that portions of the Lease covered minerals belonging to the MHA Nation. Compl. ¶ 24. Plaintiff does not question BLM's conclusion on that subject. *Id.* ¶ 4; *see also id.* ¶¶ 13–15 (describing the history of the properties subject to the Lease).

After further communications, BLM informed Plaintiff that Defendant would cancel the portions of the Lease on MHA Nation land. Compl. ¶ 28.[3] Cancellation was retroactive to the Lease's date of issuance. *Id.* Plaintiff would receive a prorated refund of all payments and royalties made in connection with canceled portions of the Lease. *Id.*; *see* 43 U.S.C. § 1734(c) (authorizing refunds of overpayments on federal leases).

Over the next three years, Plaintiff negotiated a new lease with the MHA Nation pursuant to the Indian Mineral Development Act. Compl. ¶¶ 27, 31–34; *id.* Ex. 9 at 5; *see* 25 U.S.C. § 2101 *et seq.*[4] The BIA reviewed and approved the new lease. Compl. ¶ 34. Under the new lease, Plaintiff had to pay higher royalty rates and a higher lease bonus to the MHA Nation. *Id.* ¶¶ 36–37. Plaintiff retroactively paid the higher rate for the already-extracted oil and gas. *Id.* ¶ 37.

---

[2] The well-pleaded facts are taken as true on this motion to dismiss. *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1347 (Fed. Cir. 2018).

[3] The parties gave limited attention to either the legal permissibility of a partial cancellation or the legal basis for treating a lease as valid in part and void in part. Tr. at 11–13; Def.'s Post-Argument Br. at 5. I assume without deciding that BLM's approach was procedurally correct.

[4] The Indian Mineral Development Act establishes a separate system for mineral leasing on Indian land. The parties do not discuss it in detail.

Plaintiff then sued the United States, alleging that BLM's partial cancellation breached the Lease.

## DISCUSSION

### I. Jurisdiction

This Court has jurisdiction over Plaintiff's claim. The Tucker Act authorizes the Court to hear "any claim against the United States founded … upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). Plaintiff alleges that the United States committed a breach of contract by canceling portions of the Lease. Compl. ¶¶ 28, 33. Claims for money based on breaches of contract are a common part of this Court's jurisdiction. *See Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) ("In a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract[.]").

Plaintiff's claims also meet jurisdictional requirements for timeliness. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 132 (2008). A claim for breach of contract generally accrues "when the breach occurs" and "the claimant has suffered damages." *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citations omitted). Here, the alleged breach of the Lease occurred on November 3, 2020, when BLM issued its cancellation decision. Compl. ¶¶ 28–29. Plaintiff's alleged damages accrued then. *Id.* ¶ 37. Plaintiff sued on November 1, 2024, well within the six-year statute of limitations. 28 U.S.C. § 2501.

Finally, Plaintiff — as the leaseholder — has standing to challenge the Lease's cancellation. *See First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim."); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[To satisfy the] constitutional minimum of standing … [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.") (internal quotes omitted).

### II. Merits

#### A. Standard of Review

"A motion to dismiss pursuant to [RCFC] 12(b)(6) for failure to state a claim upon which relief may be granted is appropriate when the plaintiff alleges facts that do not entitle [it] to a remedy." *Buholtz v. United States*, No. 2024-1009, 2024 WL 4647890, at *4 (Fed. Cir. Nov. 1, 2024) (citing *Godwin v. United States*, 338 F.3d 1374, 1377 (Fed. Cir. 2003)).

To state a claim for breach of contract, a plaintiff must allege, among other things, that a valid contract existed between the parties. *See San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). "[A valid] contract with the United States requires: '(1) mutuality of intent, (2) consideration, (3) an unambiguous offer and acceptance, and (4) actual authority on the part of the government's representative to bind the government in contract.'" *See Goodnow v. United States*, No. 2022-1841, 2022 WL 16943986, at *1 (Fed. Cir. Nov. 15, 2022) (quoting *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed. Cir. 2003) (itself quoting *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998))). The last element is unique to the government and arises from the principle that no officer can bind the government beyond the authority that he has been expressly delegated. *See Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1401 (Fed. Cir. 2016).

**B. Analysis**

Because the parties agree that the lease of Indian land outside the IMLA was improper, Def.'s Mot. at 2; Pl.'s Resp. at 12–13; Tr. at 37–38, 40–42, the case turns on whether the Plaintiff has a contractual remedy. Plaintiff contends that the Lease was a valid contract, and that Defendant breached it by failing to convey the promised mineral rights. Pl.'s Resp. at 9–10; Compl. ¶¶ 42–43. But Defendant argues that the Lease's flaws rendered it void *ab initio* — that is, no contract at all, and thus unenforceable by either party. *See MLB Transportation, Inc. v. United States*, 178 Fed. Cl. 385, 396 (2025) ("A contract found to be void *ab initio* has 'no legal effect[.]'") (quoting *Void*, Black's Law Dictionary (12th ed. 2024); Def.'s Mot. at 2.[5] If the government's argument is correct, then the Lease never bound the government and the government is not subject to contractual remedies for canceling it. I conclude that the Lease is void.

*1. Remedies for defective contracts.*

The parties disagree about when invalidation of a defective contract is appropriate.[6] The relevant authorities point in different directions and suggest different analyses.

[5] The Restatement (Second) of Contracts distinguishes between contracts that are "void of legal effect" and ones that are "unenforceable" for some other reason. *See* Rest. (2d) Contracts §§ 7 cmt. a, 8. Either way, no contractual damages remedy is allowed. A "void contract … is not a contract at all" because the elements of a contract are unmet. *Id.* § 7 cmt. a. But "[i]f the term 'contract' were defined to refer to the acts of the parties without regard to their legal effect," *id.*, the misnomer can be resolved. I therefore refer to the "Lease" simply to describe the document purporting to convey certain rights to Plaintiff, not to express a legal conclusion about its effect.

[6] Contracts are also void in cases of fraud or misconduct by the contractor. *See, e.g.*, *Godley v. United States*, 5 F.3d 1473, 1475–76 (Fed. Cir. 1993); *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1246 (Fed. Cir. 2007). Plaintiff's briefing focuses on the lack of fraud in this case. Pl.'s Resp. at

The Supreme Court has set out two guiding principles. First, "the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917). Second, when a statute "does not specifically provide for the invalidation of contracts which are made in violation of the statutory prohibition … the inquiry must be whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy" that the law embodies. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563 (1961). Those principles are in some tension, but lower courts are obliged to knit them together. *Cf. Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989).

The Federal Circuit's authorities are, at least on the surface, in tension with each other too. The *en banc* Circuit explained in *American Telephone & Telegraph Co. v. United States* that "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." 177 F.3d 1368, 1374 (Fed. Cir. 1999) (*en banc*) ("*AT&T*"). That means following the Supreme Court's direction to consider "the policy underlying the enactment … when the statute itself does not announce the sanction of contract invalidity." *Id.* (discussing *Mississippi Valley Generating Co.*, 364 U.S. at 563). The Circuit has applied that analysis at least twice since then. *See Seh Ahn Lee v. United States*, 895 F.3d 1363, 1372 (Fed. Cir. 2018); *United Pac. Ins. Co. v. United States*, 464 F.3d 1325, 1332 (Fed. Cir. 2006). But at least two other cases decided after *AT&T* have held contracts void based on legal violations alone, without citing or expressly performing the *AT&T* analysis. *See Sec'y of Def. v. Pratt & Whitney*, 160 F.4th 1224, 1233 (Fed. Cir. 2025); *Liberty Ammunition*, 835 F.3d at 1401–03; *see also Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1327 (Fed. Cir. 1997).

The government proposes reconciling the inconsistency by looking to the *type* of legal defect at issue. Tr. at 7–8. Cases bypassing the *AT&T* analysis have involved government agents without legal authority to enter the contract in the first place. *See, e.g.*, *Pratt & Whitney*, 160 F.4th at 1233–34 (holding no enforceable agreement where contracting officer lacked authority under federal regulations to bind government to agreement); *Liberty Ammunition*, 835 F.3d at 1401 (holding no enforceable agreement where military officer had no actual authority to bind government to nondisclosure agreement). One element of a government contract is

11–13. Plaintiff concedes, though, that voidness is possible in other circumstances as well. Tr. at 50–51.

actual authority on the part of the government agent. *Trauma Serv. Grp.*, 104 F.3d at 1325. If the government agent lacks authority, an element of a valid contract is unmet; no contract comes into existence; and any resulting agreement is necessarily devoid of legal effect.[7] Other cases, in contrast, involve government agents who are charged with entering a given contract but who violate procurement law in some way. *See, e.g.*, *Fluor Enters., Inc. v. United States*, 64 Fed. Cl. 461, 493 (2005); *Toyo Menka Kaisha, Ltd. v. United States*, 220 Ct. Cl. 210, 220 (1979); *Schoenbrod v. United States*, 187 Ct. Cl. 627, 634 (1969); *Prestex, Inc. v. United States*, 162 Ct. Cl. 620, 626 (1963). In those situations, according to the government, it makes sense for a court to also consider "whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in the statute," as *AT&T* calls for. *AT&T*, 177 F.3d at 1374 (quoting *Mississippi Valley Generating Co.*, 364 U.S. at 563) (alteration omitted).

That distinction has the advantage of explaining other disputed aspects of Circuit law on void contracts. Some cases suggest that the legal defect must be "plain" to invalidate a contract. *Schoenbrod*, 187 Ct. Cl. at 635; *United States v. Amdahl Corp.*, 786 F.2d 387, 395 (Fed. Cir. 1986); *John Reiner & Co. v. United States*, 163 Ct. Cl. 381, 386 (1963). Those cases could be read to say that a contract is not void unless the defect arose "because of some action or statement by the contractor" or unless "the contractor was on direct notice that the procedures being followed were violative of such requirements." *Amdahl Corp.*, 786 F.2d at 395 (quotes and citation omitted). But the Circuit has also said that contractors bear the risk that their government interlocutors lack actual authority to enter a valid contract. *Trauma Serv. Grp.*, 104 F.3d at 1325. In other words, contracts could be found void at any time because of lack of government authority, yet contracts are enforceable unless the contractor is on notice or at fault — a potential contradiction. One way to reconcile those cases is to say that lack of authority is a "plain" defect as a matter of law. *See CACI, Inc.*, 990 F.2d at 1236 ("There can be no clearer example of a case in which the illegality is plain and clear than one in which there is a facial absence of actual authority to enter into the contract."); *see also Brunner v. United States*, 70 Fed. Cl. 623, 629 (2006) ("When dealing with an agent of the government, … [contractors] have a duty to … [consult] publicly-available laws and regulations[.]"). Lack of actual authority would

---

[7] *Id.*; *see also, e.g.*, *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993); *Lee v. United States*, 819 F. App'x 908, 912 (Fed. Cir. 2020); *Anoruo v. United States*, 759 F. App'x 956, 961 (Fed. Cir. 2019); *Big Easy Studios, LLC v. United States*, 181 Fed. Cl. 100, 110 (2026); *Abare v. United States*, 180 Fed. Cl. 518, 526 (2026); *Sanchez v. United States*, 179 Fed. Cl. 688, 704 (2026); *6601 Dorchester Inv. Grp., LLC v. United States*, 154 Fed. Cl. 685, 693 (2021); *Panther Brands, LLC v. United States*, 146 Fed. Cl. 204, 215–16 (2019); *Weeks v. United States*, 144 Fed. Cl. 34, 46 (2019); *Northrop Grumman Sys. Corp. v. United States*, 140 Fed. Cl. 249, 275–78 (2018); *First Crystal Park Assocs. Ltd. P'ship v. United States*, 130 Fed. Cl. 260, 271–72 (2017); *Baistar Mech., Inc. v. United States*, 128 Fed. Cl. 504, 517–18 (2016).

thus simplify the voidness analysis by obviating additional inquiries into Congress's purpose or the contractor's fault or knowledge.

The government's approach, though, comes with challenges of its own. One is that even if some of the Circuit's decisions could be explained by the authority of the government agent, the Circuit has never *said* that the applicability of *AT&T* depends on the government agent's authority.

Another challenge is ambiguity about what government "authority" means in the context of government contracts. The Circuit has sometimes said government agents lack "authority" — and therefore do not bind the government — when they make ordinary procurement law errors. *See Johnson Mgmt. Grp. CFC, Inc. v. Martinez*, 308 F.3d 1245, 1255–56 (Fed. Cir. 2002) (contracting officer adopted a contract modification that violated the Federal Acquisition Regulation's advance-payments clause); *Total Medical Management, Inc. v. United States*, 104 F.3d 1314, 1320 (Fed. Cir. 1997); *Toyo Menka Kaisha*, 220 Ct. Cl. at 220 (contracting officer accepted a nonresponsive bid); *Prestex*, 162 Ct. Cl. at 625–26 (contracting officer awarded bid in violation of Armed Services Procurement Act). If all contractual compliance questions implicate government authority — and in turn lead to categorical invalidation of contracts when authority is lacking — then there is little room anywhere for *AT&T*'s case-specific analysis.[8] In at least some contexts, government action "can be authorized … even if it is unlawful or done without legal authority." *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1023 (Fed. Cir. 2024) (addressing takings law). Some post-*AT&T* cases could be referring to "authority" in that sense, but again, they have not said so.

The bottom line, then, is that after the *en banc* Federal Circuit in *AT&T* addressed how questions about contract voidness should be analyzed, courts have sometimes applied the analysis and sometimes not. Although the government's proposed explanation has some explanatory power, it does not describe all cases and rests on an unresolved conceptual question.

Whatever *AT&T*'s application is, the next question is about its substance. When courts apply *AT&T* to determine whether a defective contract is void, they focus

[8] *See Prestex*, 162 Ct. Cl. at 625 ("[A] contracting officer, as agent of the executive department, has only that authority actually conferred upon him by statute or regulation.") (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947)); *see also Fed. Crop Ins. Corp.*, 332 U.S. at 385 ("The scope of [a government agent's] authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power."); *Johnson Mgmt. Grp.*, 308 F.3d at 1256 ("[T]he government is not bound by the acts of its agents that are contrary to statute or regulation."); *cf. City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013) ("[T]he question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.").

on certain factual and legal questions. Cases where the contract is enforceable have certain common characteristics.

Courts should enforce contracts where — as in *AT&T* itself — contractual performance is complete. "[I]nvalidation of a contract after it has been fully performed is not favored." *AT&T*, 177 F.3d at 1375–76 (collecting cases); *see also United Pac. Ins. Co. v. United States*, 68 Fed. Cl. 152, 158–59 (2005), *aff'd*, 464 F.3d 1325 (Fed. Cir. 2006) (declining to void a fully performed contract that violated statutory oversight procedures); *Peanut Wagon, Inc. v. United States*, 167 Fed. Cl. 577, 595 (2023) (declining to void a fully performed contract that failed to comply with a regulatory notice requirement). After performance, remedies include "sustain[ing] the contract, reform[ing] it to correct the illegal term, or allow[ing] recovery under an implied contract theory," but "courts have not, however, simply declared the contract void ab initio." *AT&T*, 177 F.3d at 1376; *but see Fluor Enters.*, 64 Fed. Cl. at 495 (holding contract void despite complete performance).

Courts also decline to consider contracts invalid when doing so would be inconsistent with Congress's expressed purposes. In *AT&T*, the procuring agency failed to comply with "internal review and reporting procedures" required by statute. 177 F.3d at 1376. But the relevant statute's legislative history "stated explicitly that noncompliance was not intended to be 'the basis for litigating the propriety of an otherwise valid contract.'" *Id.* at 1374 (quoting S. Rep. No. 100-326, at 105 (1988)). The Federal Circuit thus complied with Congress's expressed wishes and declined to hold the contract void. *Id.* at 1376 & n.2.

Beyond express statements about congressional policy, there are circumstances where invalidation would undermine a regulatory system in some way. In *AT&T*, the Circuit believed it would be outside "the judicial role to discipline [an] agency's noncompliance with the supervisory and reporting instructions of congressional oversight." *AT&T*, 177 F.3d at 1375. That implies that violations of contract oversight requirements are between Congress and the agency, rather than between the agency and the contractor.

Invalidation can interfere with Congress's policy decisions in other ways too. In *Seh Ahn Lee v. United States*, the parties' arguments about the validity of personal services contracts depended in part on whether "the degree of government supervision or other factors make the role of the contracting party more like that of an employee than an independent contractor." 895 F.3d at 1372. But the panel noted that the relevant contracts had been authorized by Congress in order to improve the agency's "flexibility" and "responsiveness to crises." *Id.* (quoting H.R. Rep. No. 107-57, at 75 (2001)). Congress's purposes, the panel held, would be frustrated by "the

invalidation of particular contracts *ab initio* if the administration of the contract were later determined to cross the often fuzzy line between independent contracting and employment." *Id.* The court therefore held that invalidation would not be an appropriate remedy. *See id.*; *see also United Pac. Ins. Co.*, 68 Fed. Cl. at 158–59.

Invalidation is not a foregone conclusion when a government contract is defective, and there are certain situations where it is inappropriate. But absent the kinds of considerations that justify another remedy, it appears that voiding the contract is often essential to protecting the purpose and public policy embodied in the statute. *AT&T*, 177 F.3d at 1374.

2. *The Lease is void.*

Here, the parties failed to follow the processes established in the IMLA before leasing mineral rights held in trust for the MHA Nation. I conclude that those defects render the Lease void and unenforceable, which means Plaintiff cannot state a claim upon which relief can be granted.[9]

If — as the government contends — government contracts are void whenever the agency lacks authority, the Lease is invalid for that reason alone. *See Trauma Serv. Grp.*, 104 F.3d at 1325 ("A contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States."). The government entered the Lease in violation of mandatory procedures applicable to Indian land. *See* 25 U.S.C. § 396a; 25 C.F.R. § 211.20. The leasing process was handled by BLM, Compl. Ex. 1 at 1, not BIA, the correct agency. *See* 25 C.F.R. §§ 211.20(a), 211.3. Moreover, the government did not have statutory authority to lease the MHA Nation's land at all — only the tribe could do that, subject to federal approval. *See* 43 C.F.R. §§ 3160.0-3, 3180.0-3. Authority (on any definition of the term) was therefore lacking at every level.

Plaintiff may not have been aware that the BLM lacked authority to enter the Lease. The parties dispute whether Plaintiff reasonably *could* have known. *See* Tr. 55–56, 75–76; Pl.'s Post-Hearing Br. 7–8; Def.'s Post-Argument Br. 6–7. But that risk was always Plaintiff's, just as every other party contracting with the federal government assumes the risk that government agents do not have actual authority. *Edwards v. United States*, 22 Cl. Ct. 411, 421 (1991); *see also, e.g.*, *Trauma Serv. Grp.*, 104 F.3d at 1325; *Fed. Crop Ins. Corp.*, 332 U.S. at 384. On the government's reasoning, no more analysis is required.

[9] I do not reach Defendant's alternative argument that statutory authorization for refunds of lease overpayments displaces Plaintiff's remedy for breach of contract. *See* Def.'s Mot. at 19; 43 U.S.C. § 1743(c).

In the alternative, those same errors render the Lease void under the *AT&T* analysis.

This is not a case where the contract has been fully performed. One of the major grounds for enforcing a defective federal contract is therefore inapplicable from the start. *See, e.g.*, *AT&T*, 177 F.3d at 1375–76; *Seh Ahn Lee*, 895 U.S. at 1372; *Peanut Wagon*, 167 Fed. Cl. at 595. Nor has Congress expressly provided that leases of Indian land are valid despite the errors present here. *AT&T*, 177 F.3d at 1374, 1376 & n.2.

Invalidation would also be "consistent with and essential to effectuating the public policy embodied in" the IMLA. *AT&T*, 177 F.3d at 1374 (quoting *Mississippi Valley Generating Co.*, 364 U.S. at 563). The IMLA establishes "detailed uniform leasing procedures designed to protect the Indians." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) (citing 25 U.S.C. §§ 396b–396g); *see also* 25 U.S.C. § 396a. It ensures that Indian mineral owners maintain control over their mineral rights, including the final say over whether their land will be leased at all. 25 U.S.C. § 396a; 25 C.F.R. § 211.20. When negotiations occur, the Indians have the lead role, not the government. 25 U.S.C. § 396b; 25 C.F.R. § 211.20(b)(6), (d); *see also United States v. Navajo Nation*, 537 U.S. 488, 508 (2003) ("The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties."). The IMLA also guarantees Indians the advice and protection of federal officials specifically charged with Indian welfare. *Ute Mountain Ute Tribe*, 660 F.3d at 1180 n.6. But the Lease was executed without procedures the IMLA was supposed to guarantee. That "contravene[s] a central tenet of" the IMLA. *See Council for Tribal Emp. Rts. v. United States*, 112 Fed. Cl. 231, 249 (2013), *aff'd*, 556 F. App'x 965 (Fed. Cir. 2014) (mem.) (finding contractual amendments that violated the Indian Self-Determination and Education Assistance Act to be void *ab initio*).

Plaintiff's main counterargument is that invalidation is unnecessary to carry out the IMLA's purposes. Tr. at 64. According to Plaintiff, the Lease conveyed no valid interest in Indian mineral rights (a "leasehold," in Plaintiff's terms), so Indian land is safe whether the Lease is valid or not. Instead, BLM's failure to convey mineral rights belonging to the MHA Nation amounts to a breach of contract, enforceable against the government. Pl.'s Resp. at 10; Tr. at 36–45, 85–86; Pl.'s Post-Hearing Br. at 6–7. That argument — which was alluded to in briefing but more developed at argument and supplemental briefing, *see* Pl.'s Post-Hearing Br. at 6–7 — is plausible in some ways but does not ultimately succeed.

It is not certain, first of all, that Plaintiff's position would carry out the IMLA's policy of protecting the MHA Nation as well as invalidation. Plaintiff argues that, as

a practical matter, the MHA Nation should be indifferent to whether the Lease is void: Plaintiff received no rights to Indian land from the government, and ultimately had to negotiate a new lease with the MHA Nation. *See* Tr. 57–58, 73–74. Nonetheless, I question whether it would necessarily be true from a tribe's perspective in every circumstance — for example, if the government failed to cancel a lease or if a lessee fails to cooperate as Plaintiff did. At a minimum, voiding a lease heads off more complicated disputes about a tribe's rights and remedies. The parties did not brief those issues in detail, and they speculate belatedly about the answers. *See* Tr. at 23–25, 58–61; Pl.'s Post-Hearing Br. at 8.[10] Invalidation of the statute definitely carries out the IMLA's purposes; Plaintiff's approach is less certain.

In the event of doubt about whether Plaintiff's position protects the tribe as well as voidness would, this case implicates the principle that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana*, 471 U.S. at 766. Although the parties have not identified any precisely analogous case, the Federal Circuit has also stated that "the statutory requirements regarding the transfer of Indian lands may not be waived or ignored." *See Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1037 (Fed. Cir. 2012).

The premise of Plaintiff's argument — that the government can execute a valid lease that suffers from numerous legal defects and conveys no property rights at all — is not well substantiated either. Although Plaintiff is correct that a private party may breach a contract by promising to convey property rights and failing to do so, *see Fibela v. Wood*, 657 S.W.3d 664, 675–76 (Tex. App. 2022), that principle does not necessarily apply the same way when the federal government violates its procedures, let alone when it acts through agents who lack statutory or regulatory authority to lease the land.[11]

---

[10] Along similar lines, Plaintiff argues that enforcing the Lease would encourage the government to follow its own laws. Tr. at 65–66. Contracting incentives are complex, though, and cases show that arguments for invalidation sometimes come from the government and sometimes from the contractor. *Contrast AT&T*, 177 F.3d at 1373 (contractor arguing for voidness), *with Prestex*, 162 Ct. Cl. at 625–26 (government arguing for voidness). That makes it hard to predict the distributional effects of broadening or narrowing the remedy of invalidation.

[11] The other authorities cited by Plaintiff for that principle are not particularly persuasive either. First, the panel in *Solenex LLC v. Bernhardt* suggested that a plaintiff may bring a breach of contract claim in this Court for a canceled federal lease. *See* 962 F.3d 520, 530 n.4 (D.C. Cir. 2020) (citing *Griffin & Griffin Expl., LLC v. United States*, 116 Fed. Cl. 163, 176 (2014)). That case, though, involved a BLM-issued lease on federal land where authority to execute the lease was not disputed. *See id.* at 522. Second, *In re Martinek* considered whether an assignment of a property interest conveyed that property interest under state law. 488 N.E.2d 1332, 1336 (Ill. App. 1986). That sheds little light on whether the federal government breached an unlawful lease by canceling it.

Plaintiff relies heavily on *Griffin & Griffin Exploration, LLC v. United States* to argue that the government can breach a lease when it fails to convey a valid leasehold. But the facts of *Griffin* are very different from those here. In *Griffin*, the Court declined to find that a lease for federal mineral rights pursuant to the MLA was void because BLM had already conveyed those mineral rights to a third party. 116 Fed. Cl. at 168, 173. The Court instead held that the lease was a valid contract that the government breached by failing to convey a valid leasehold interest. *Id.* at 175–76. There was no question that the proper officials had executed a lease of property under their management, using the proper statutory and regulatory procedures. *Id.* at 168–69, 173 & n.9. That is quite unlike this case, where the wrong bureau leased someone else's land using the wrong statutory system.

Attempting to bridge the gap, Plaintiff cites Department of the Interior decisions declaring that the department "is without authority" to lease the same tract twice. Pl.'s Post-Hearing Br. at 5–6 (citing *In re Whitaker*, 63 I.D. 124, 125 (1956), and *In re Massa*, 63 I.D. 279, 286 (1956)). Plaintiff thus argues that the error all comes down to authority: The officials in *Griffin* had no authority to execute the faulty lease, yet the Court held the government liable, 116 Fed. Cl. at 173, 179, and the same should happen here.

That does Plaintiff no good. Plaintiff has not shown that those authorities were before the Court in *Griffin*, so the Court may not even have been asked to consider whether the error went to BLM's authority. Plus, if the error in *Griffin* really went to the agency's authority, then the lease in that case was likely void and *Griffin* was wrongly decided. *Trauma Serv. Grp.*, 104 F.3d at 1325.

More likely, though, Plaintiff has simply found one of the many imprecise references to agency "authority" that obscure rather than clarify the applicable rules. The *Griffin* Court emphasized that a government official who makes a factual mistake *within the scope of his authorized duties* may still bind the government in contract. *See Griffin*, 116 Fed. Cl. at 173 n.9 (citing *Cooke v. United States*, 91 U.S. 389, 398 (1875)). Here, it was never within the scope of the BLM official's authorized duties to execute a lease on MHA Nation land, let alone without the tribe's involvement.

A void contract is treated as if it never existed. *Cf. Dow Chem. Co. v. United States*, 226 F.3d 1334, 1345 (Fed. Cir. 2000). When the parties discovered their error, they did the right thing. Plaintiff negotiated a new agreement with the MHA Nation in good faith, and Defendant refunded all payments that Plaintiff made in connection with the canceled portions of the Lease. Although Plaintiff would prefer the Defendant to also pay the difference between what Plaintiff expected to earn and

what it must now pay the MHA Nation, no more can be required of Defendant on a void and unenforceable contract.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss (ECF 14) is **GRANTED**.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge